# SUPREME COURT — APPELLATE DIVISION — SECOND DEPARTMENT.

## February 7, 1919.

## THE PEOPLE v. HAROLD MOYER.

(186 App. Div. 278.)

(1.) MAIMING AND ASSAULT IN SECOND DEGREE AS FOURTH OFFENSE—NEW TRIAL—VERDICT AGAINST WEIGHT OF EVIDENCE.

Evidence upon which a defendant was convicted of the crime of maiming and assault in the second degree as a fourth offense examined, and *held*, that a new trial should be granted under section 527 of the Code of Criminal Procedure, providing that ''And the appellate court may order a new trial if it be satisfied that the verdict against the prisoner was against the weight of evidence.''

(2.) SAME—PRESUMPTION OF INNOCENCE—REASONABLE DOUBT.

Under section 389 of the Code of Criminal Procedure a judgment of conviction should not be sustained unless the proof justifies a conclusion by the jury that the prosecution overcame the presumption of the defendant's innocence by proof to the contrary, and satisfactorily established his guilt beyond a reasonable doubt.

(3.) SAME—EVIDENCE OF POLICE DETECTIVE AS TO ADMISSIONS OR CONFESSIONS BY DEFENDANT.

Testimony by a police detective as to oral admissions by the defendant in the nature of a confession should be weighed in consideration of his calling and his official relation to the case.

APPEAL by the defendant, Harold Moyer, from a judgment of the County Court of Kings county, rendered against him on or about the 18th day of June, 1917, convicting him of the crime of maiming, and assault in the second degree, as a fourth offense.

*Edward J. Reilly,* for the appellant.

*John E. Ruston, Assistant District Attorney (Harry E. Lewis, District Attorney,* with him on the brief), for the respondent.

JENKS, P. J.:

The defendant, appellant, was convicted in the County Court upon an indictment for maiming and for assault in the second degree as a fourth offense. I think that we should order a new trial, pursuant to the part of section 527 of the Code of Criminal Procedure that provides: " And the appellate court may order a new trial if it be satisfied that the verdict against the prisoner was against the weight of evidence." The verdict against the defendant should not stand unless the proof justified a conclusion by the jury that the prosecution had overcome the presumption of the defendant's innocence by proof to the contrary, and had satisfactorily shown his guilt beyond a reasonable doubt. (Code Crim. Pro., § 389. See People v. Mantin, 184 App. Div. 767, and cases cited.)

The crime was committed in a city street by a blow that cut McMahon's face and eye so that the eye was extracted in a hospital. McMahon, with other men and women inmates of a dram-shop, had been put out into the street at the closing hour of one A. M. McMahon testifies that he received the blow as soon as he came out and after he had walked three or four paces. If McMahon is correct there is no proof that makes against the defendant. McMahon and the defendant were strangers. The defendant had been in the dram-shop and was in the crowd that congregated in the street after the shop was closed. But the two men were of different groups in the dram-shop, and although we may infer that all was not harmonious, for McMahon testifies that he had struck Kelly in the dram-shop, McMahon says (and none other testifies to the contrary) that he had neither words nor quarrel with the defendant and does not even remember that the defendant was present when Kelly received this

blow. The defendant says he separated McMahon and Kelly, but it does not appear that the defendant was a friend or an adherent of Kelly. McMahon could not, either in the hospital when defendant was brought before him, or on the witness stand, identify the defendant as his assailant, for he describes the blow as dealt from behind by some one unknown to him. There is not a particle of testimony, direct or circumstantial, that indicates that the defendant struck McMahon at the time or under the conditions testified to by McMahon. The theory of the prosecution is that the blow was struck with a glass bottle. There is medical evidence that the injury could have been caused by such a thing. There is no proof that any such thing was found on the scene.

The evidence adduced against the defendant is in the testimony of Berryman and Patten. Berryman testifies that he was present near the scene; Patten is the police detective who undertook to investigate the crime. His connection with the case began after the affair, and his testimony is limited to the oral admissions of the defendant after Patten had taken him to a detective branch house. Although Berryman testifies that he was near the scene of the crime, there is none who testifies to that presence. His testimony may be summarized as follows: He had met the defendant, whom he knew, at an oyster place 13 blocks from the dram-shop and refused defendant's invitation to go out with him, but for no stated nor apparent reason he had gone thereafter to the neighborhood of the dram-shop and had stood in the street opposite it, 40 or 45 feet distant, for 20 minutes and until 1 A. M., when he saw the inmates come out at the closing hour. As some were on the corner he saw under the big arc-light Walsh attempt to strike the defendant, who was not the aggressor, and defendant put up his hands to ward off the blow. Kennedy went to separate them, Walsh struck Kennedy who struck back, felling Walsh to the ground, and went to walk away. McMahon was not in that quarrel,

but stood " cater-cornered " with his overcoat on his arm.   Then Berryman saw the defendant raise his arm, whereupon the witness turned away, and as he did so he heard the crash of bottles and there was " a gang fight."   After walking five steps he turned and saw McMahon lying on the ground and two others prostrate.

Upon his direct examination he did not testify that he saw the defendant strike McMahon.   He did not testify that he saw the defendant even deal a blow.   He testifies that this occurrence did not take place until after the fights of Walsh and the defendant, and Walsh and Kennedy, and that McMahon was then present, apparently unharmed.

If Berryman is correct, then McMahon is incorrect when he says that he was struck as soon as he came out of the dram-shop and had walked three or four paces.   Indeed, Berryman says about six minutes had elapsed after McMahon had come out before McMahon was struck.

So to speak, he disqualified himself as an eye-witness of the act that constituted the crime by his testimony that he turned his head and began to walk away.   He but testifies to a conclusion from his inference, and his mental process may be thus described:   I saw a crowd of a number of men of whom some were McMahon, Kennedy, Walsh and the defendant.   I saw a fight between Walsh and the defendant, who was not the aggressor but who put up his hands to ward off Walsh's blow. I saw Kennedy interfere, Walsh strike Kennedy and Kennedy strike back.   I saw the crowd surge towards McMahon and the defendant.   *"Then"* I saw defendant's arm raised.   Thereafter I saw McMahon " stagger."   I saw no other arm raised. I turned to walk away and walked about five feet and *" then "* I heard the crash of bottles and there was a gang fight.   I turned and saw McMahon prostrate with others.   The crowd ran, but defendant walked away.   I *learned* soon after that McMahon had been injured so as to indicate a blow.   I con-

clude that McMahon was injured by a blow, and as a raised arm may be preliminary to a blow I conclude that the raised arm of the defendant resulted in that blow.

I am not speaking of the strength or weakness of the conclusion. I am but pointing out that Berryman did not testify as an eye-witness to any act that accomplished the crime, even to the extent of testifying that the raised arm was continued in the action of even *attempting* a blow. Berryman himself characterizes his testimony when on cross-examination he is asked: " Q. *You say the raising of the arm by Mr. Moyer* (the defendant) *gave you the impression that he attempted to strike Mr. McMahon? A. Yes, sir."* Upon cross-examination he had testified that he saw Moyer raise his hand and punch McMahon. " Q. He punched McMahon? A. He raised his arm * * * Q. * * * he struck McMahon? A. Yes." Moyer " walked to the left side of McMahon." When the men approached Moyer (the defendant), he punched McMahon and walked away. The defendant had been in the crowd for " two minutes." " After he struck—raised his arm (note the correction) to McMahon, he walked away. * * * Q. Did you see where the blow struck Mr. McMahon ? A. As I said before, it raised towards his shoulder. Q. *Did you see the blow strike Mr. McMahon? A. Did I say I saw the blow strike Mr. Mc-Mahon? I couldn't see it. Q. Did you see the blow strike Mr. McMahon? A. No, sir; I walked away. Q. So that you don't know now whether Mr. Moyer struck Mr. McMahon? A. I didn't say he did strike him.* * * * Q. *So you don't know whether somebody in the crowd struck McMahon or not? A. No; I couldn't say that. Q. You say the raising of the arm by Mr. Moyer gave you the impression that he attempted to strike Mr. McMahon? A. Yes, sir."*

Twenty-five minutes after the affair, Berryman testified that in company with Larkin he met defendant, and when defendant

spoke of the affray and the witness said it was a shame, de-fendant said " they deserved all they got."

Berryman appears as a young man of the same walk of life as the defendant, who had drifted from one calling to another with intervals of idleness. His testimony is not clear or co-hesive. And he has the significant habit of repeating the ques-tion before delivery of his answer. He was a bystander at night, 40 or 45 feet away, who viewed a series of quarrels by a crowd of men under an arc-light. He does not testify to a *duel* between McMahon and defendant. Could he be relied upon to articulate correctly the various actions incident to these night brawls among these various men? He told of a preliminary fight between Walsh, who attacked Moyer, that shifted to Ken-nedy when Kennedy attempted to separate them. At that time he said he saw Moyer " put his hands up " to ward off Walsh's blow. Is it not possible that after Berryman had learned of the injury to McMahon, Berryman attributed this putting up of defendant's hands as the " raised arm " that could account for the blow subsequently dealt by some one to McMahon? Berry-many says at the time Moyer raised his arm, " Walsh (was) out on the sidewalk then." The author of " On the Witness Stand " concludes his chapter " The Memory of the Witness " with these words: " And yet we have not even touched one factor which, more than anything else, devastates memory and plays havoc with our best intended recollections; that is, the power of sug-gestion." (Munsterburg, p. 69.) But even the purpose of the " raised arm " *at any time* is but an inference. It was entirely possible that the defendant raised his arm to defend himself, not to strike. Berryman's testimony at no time reveals the defendant as an aggressor, but the contrary.

Police detective Patten's testimony is to admissions in the nature of a confession by Moyer that he struck McMahon a blow. I shall not consider the oft-cited and somewhat inharmonious expressions of judges and of commentators as to confessions.

Chamberlayne approves the observation of Wigmore, that "if we distinguish the confession as evidence from the evidence of the confession, we find that few have ever really doubted that the first is in itself of the highest value, while the second is always to be suspected." (Chamberlayne, Modern Law of Evidence, § 1607, citing Wigmore Ev., § 866.) And the Court of Appeals is of opinion that the confession itself is of the highest and most satisfactory evidence, but quotes as a very proper observation the statement of Greenleaf, that "the evidence of verbal confession of guilt is to be received with great caution." (Vol. 1 [16th ed.], § 214; People v. Bennett, 37 N. Y. 133.) Patten's testimony relates to oral admissions only. I do not reflect upon the character of Patten when I comment that his testimony should have been weighed in consideration of his calling and his official relation to the case. He apprehended Moyer and undertook to ferret out the criminal — a praiseworthy action. Chamberlayne, writing of the familiar danger to which our reported statements are liable, says: " The statement may not have been correctly understood, the declarant may have failed to express himself as he intended, he may not be correctly, though honestly, reported. There is even greater danger that the declaration will be dishonestly reported, be fabricated or distorted. The source of information is frequently polluted by * * * the *zeal of a police officer twisting every statement into proof of guilt.* As against the denial of the accused, such evidence may well be viewed with suspicion." (Chamberlayne, *supra,* § 1607.) And in Commonwealth v. Curtis (97 Mass. 574, 578) it is declared: " No cases require more careful scrutiny than those of disclosures made by a party under arrest to the officer who has him in custody." (See, too, Moore on Facts, § 1044, and cases cited, especially People v. Knapp, 42 Mich. 267, 270, per COOLEY, J.) Patten's testimony is to admissions made by the defendant after Patten had taken him to the detective branch house. There was practically

but one interview.    Kennedy was brought in to defendant, there was some conversation, Kennedy was told to go out or to step aside out of hearing, then there was further conversation between the detective and the defendant while together, then defendant was taken to the hospital where the injured man, McMahon, was confined, and confronted with McMahon and (to quote the language of the detective) " Then we came back to the Branch and we had this conversation I just spoke of before."    The admissions were oral, testified to by the detective alone as made to that detective alone.    Of course, none can contradict the witness save the defendant.    This detective testified that Kennedy after hesitation, in answer to a question by the detective, said that he saw defendant strike McMahon, whereupon the defendant said, " you know I didn't hit him " — not only a denial, but a statement that Kennedy knew otherwise. It does not appear that Kennedy reiterated the charge.    Why should the defendant, as soon as Kennedy had withdrawn, acknowledge to the detective alone that he did strike McMahon ? (In fact, he did not, even if we credit the detective's testimony, as I shall presently show; but the witness would have it so.) Then the detective took the defendant into the presence of McMahon, who stated that he could not identify defendant as his assailant, and then, almost immediately on his return to the detective branch, the defendant, who had just declared to the detective after McMahon's inability of identification, " You see he don't know who hit him, that leaves me out of it," admitted to that detective alone that defendant did strike McMahon. The alleged admission of the defendant before he was taken to the hospital, as testified to by the detective, is, " It was an all around fight, and this fellow that hit me, I hit him back again. I defended myself."    This statement neither named McMahon nor described him.    For none testifies that McMahon had hit the defendant.    Such a description might refer to Walsh, who had attacked Moyer.    Moreover, if the defendant had made

such a statement referring to McMahon, and thus had incriminated himself to the detective, why should he have said later to that very detective, after McMahon had refused to identify defendant, " that leaves me out of it? "

In fine, the jury were asked to believe that at the same interview, after defendant had faced Kennedy as an accusing eyewitness with a denial, he confessed, and then, after he had found that the injured man himself could not identify him — a fact that made for his denial so that the defendant declared it freed him — he almost immediately confessed. The only suggested reason for such tergiversation that led to self-crimination is found in the fact that Patten testifies that he said to the defendant after McMahon had failed to identify him, " Oh, no, we have some witnesses that can testify you committed the assault." But this would hardly induce confession after Kennedy had been produced and the defendant had faced him down, and his declaration of innocence had been supported thereafter by McMahon's inability to identify him.

Of course, the detective's testimony that Kennedy had said at the interview described that he saw defendant strike Mc-Mahon was not evidence; it was admissible only to show the conduct of the prisoner in response to that statement. (People v. Conrow, 200 N. Y. 356.) A John J. Kennedy, although a witness before the grand jury, was not a witness at the trial.

When the jury came to weigh the evidence, there was in the scale of the defendant the presumption of his innocence and the doctrine of reasonable doubt. The defendant had testified that he did not strike McMahon, and that he did not tell the detective Patten that McMahon struck him and he struck back. He had testified that McMahon had danced with Kelly in the dram-shop and had struck Kelly, and that the defendant tried to pacify them and to separate them. McMahon had testified that he did strike Kelly in the dram-shop, that he did not know whether the defendant was then present. The defendant had

testified that when he came out at the closing hour he stood by himself on the corner; Walsh wanted to "lick" him, raised his hand against him, but accidentally struck Kennedy, who returned the blow; that he did not see McMahon, but after the blow by Kennedy he (the defendant) walked away, when the officer stopped him.    The defendant had been corroborated by Berryman as to the attack by Walsh, and as to the subsequent fight between Walsh and Kennedy.    The defendant had testified that he saw a general scuffle after Walsh was struck, and he saw. McMahon there; that he did not strike McMahon at any time. The defendant had testified that the officer asked the people at the scene of the affray whether the defendant had assaulted McMahon, but none pointed him out and none said he took part in the scuffle.    This latter statement was corroborated by that officer.    The defendant had testified that at the conversation testified to by Berryman, held shortly after the "trouble," between Berryman, Larkin and himself, Berryman in the presence of Larkin said to Moyer "it was a shame for Jackie Murtha to use a bottle on this man."    Berryman had not been recalled to contradict this testimony, Larkin had not been called as a witness.    It was stipulated on the record that defendant's attorney had served Murtha with a subpoena to testify.    It does not appear that Murtha had responded.    Defendant had admitted on cross-examination that he and Kennedy were confronted at the police station under the charge of detective Patten, and when Kennedy said that he had seen defendant "there," defendant had not recalled that Kennedy said that defendant had struck McMahon.    The defendant had denied that he had said to Patten that McMahon struck him and he struck back.

Against the defendant there were proved four previous convictions, as stated in the indictment, but none of them essentially involved physical force; one was for the possession of narcotics, two for receiving stolen goods, and the fourth for an attempted

burglary. The sentence was life imprisonment; the court had no alternative. The court tried the case carefully and well, but I think that the jury erred in its verdict.

A new trial should be ordered.

RICH, PUTNAM, KELLY and JAYCOX, JJ., concurred.

Judgment of conviction of the County Court of Kings county reversed, and new trial ordered.