SUPREME JUDICIAL COURT 
 
 COMMONWEALTH vs. SCOTT MORRISON

 
 Docket:
 SJC-13527
 
 
 Dates:
 March 4, 2024 - October 8, 2024
 
 
 Present:
 Budd, C.J., Gaziano, Kafker, Wendlandt, Georges, & Dewar, JJ.
 
 
 County:
 Norfolk
 

 
 Keywords:
 Kidnapping. Practice, Criminal, Required finding, Instructions to jury. Statute, Construction. Evidence, Joint venturer, Intent. Joint Enterprise. Intent. Words, "Thereby."
 
 

       Indictments found and returned in the
Superior Court Department on July 31, 2014, and April 29, 2016.
      The cases were tried before Robert C.
Cosgrove, J.
      After review by the Appeals Court, 103
Mass. App. Ct. 263 (2023), the Supreme Judicial Court granted leave to obtain
further appellate review.
      Timothy J. Bradl for the defendant.
      Pamela Alford, Assistant District
Attorney, for the Commonwealth.
      GEORGES, J.  This appeal concerns whether aggravated
kidnapping under G. L. c. 265, § 26, third par., requires a
defendant to inflict serious bodily injury using the dangerous weapon with
which he is armed, or whether serious bodily injury may be inflicted through
other means.  Pursuant to the rule of lenity,
we conclude the dangerous weapon with which a defendant is armed must be used
to inflict serious bodily injury to sustain a conviction of aggravated
kidnapping.  The jury in this case were
instructed to the contrary, resulting in prejudice to the defendant.  Accordingly, the defendant's conviction of
aggravated kidnapping cannot stand.
      1. 
Background.  a.  Facts. 
The jury could have found the following facts.  
      i. 
The kidnapping.  The defendant's
involvement in the kidnapping can be traced back to a jealousy-fueled scheme
devised by James Feeney.  Feeney and the
victim, James Robertson, were romantically involved with the same woman, who
ultimately "chose" the victim over Feeney.  As a result, Feeney plotted revenge against
Robertson. 
      To aid him in his plot, Feeney enlisted
the help of two confederates, his cousin Alfred Ricci and the defendant, who
was Feeney's car mechanic.[1]  Feeney was
aware that the victim had been ordered to undergo random drug testing.  Using this knowledge to his advantage, Feeney
hatched a plan to kidnap the victim.  The
plan called for the defendant and Ricci, while masquerading as probation
officers, to go to the victim's home, tell the victim they were taking him in
for a random drug test, but then bring him to Ricci's garage where Feeney would
be waiting to "question" and "scare" the victim.  In preparation for the kidnapping, Feeney
obtained police records concerning the victim, the victim's photograph, a gun,
a police badge, and a pair of handcuffs.[2] 
Additionally, at Feeney's direction, Ricci and the defendant bolted a
metal chair to the floor of Ricci's garage "so it would look real."
      At around 10:30 A.M. on January 1, 2014,
the defendant picked up Ricci in the defendant's car.  As planned, Ricci and the defendant were
dressed with the intention of impersonating probation officers; the defendant
wore a dark coat, a police badge on his belt, and a black gun in a holster on
his waist.  In the front passenger seat
was a black duffel bag, with Ricci taking the back seat.  
      After driving to the victim's home, where
the victim lived with his parents, the defendant parked across the street from
the house and grabbed the victim's police records that Feeney had
obtained.  The defendant then got out of
the vehicle and went to the victim's door. 
Once the victim came outside, the defendant indicated he was there to
take the victim to a site for random drug testing and displayed the police
paperwork.  The victim briefly went back
into the house and told his parents that he had to go with the "constables"
to take a random drug test.  When the
victim's father asked how the victim knew that the men were constables, the
victim said they "had guns and badges and paperwork."  
      After the victim changed clothes --
putting on jeans, a sweatshirt, and sneakers -- he went back outside,
followed by his mother.  The victim asked
if the testing was "for court," and the defendant answered
affirmatively.  When the victim asked
where they were going, the defendant responded "Dedham."[3]  After the victim's mother asked if the
defendant would bring the victim home, the defendant "kinda smirked"
and assured her:  "Yeah.  We'll bring him home."  The defendant then seated the victim in the
rear of the car, where Ricci placed him in handcuffs, and drove off.  
      Instead of driving to Dedham, the
defendant drove to Ricci's house in Canton as Feeney instructed, where Feeney
was waiting for them in a car parked in the driveway.  The defendant grabbed the black duffel bag
from his own car and handed it to Feeney. 
At Feeney's instruction, the defendant and Ricci removed the victim from
the car, brought him into the garage, and sat him down on the metal chair they
had fastened to the floor.  
      Feeney then entered the garage wearing a
black ski mask and carrying the black duffel bag.  He placed the duffel bag down near the metal
chair and proceeded to shackle the victim's ankles to the chair.  Ricci saw a black police baton on top of the
duffel bag; at trial, he could not recall whether the baton was in Feeney's
hand before Feeney dropped the bag. 
Feeney told Ricci and the defendant to leave and that no one was to come
into the garage.  
      Upon leaving the garage, Ricci and the
defendant smoked cigarettes in front of Ricci's house and did not hear any
sounds coming from the garage.  They then
went to a hardware store a short distance away. 
When the pair returned from the store, Feeney's car was still parked in
the driveway.  The two men worked on
another car that was also parked at Ricci's house for about twenty minutes.  Ricci then walked by the garage and heard an
"oomph" sound coming from within.
      At trial, Ricci recalled that, after
completing work on the car, the defendant left to repair another car
elsewhere.  Once the defendant left,
Feeney emerged from the garage and again told Ricci that no one was to enter
the garage.  At some point, Ricci saw
Feeney get in his car and leave.  Ricci
went inside the house to join his family members, who were celebrating the new
year.  While inside the house, Ricci received
two or three phone calls from Feeney. 
During one of the calls, Feeney told Ricci he wanted to question the
victim more, "rough him up a little bit," and then "drop him off
at the end of the street."  
      Later in the evening, at around 11:10 P.M.,
Feeney called again and asked Ricci to "give him a hand."  Ricci responded that he could not help
because he was spending time with his cousin, who was going to Florida the next
day, and suggested that Feeney call the defendant instead.  
      After Ricci's cousin left at around 12:25
A.M., Ricci came out of the house, saw Feeney's car in the driveway, and
entered the garage.  There, he observed
Feeney standing over the victim's dead body, which was partially wrapped in a
tarp, along with the defendant standing to the right of the body.  Feeney removed the victim's claddagh[4] ring
and put it in a pocket of the victim's jeans. 

      After Feeney indicated they needed to
dispose of the victim's body, Ricci and the defendant carried the body to
Feeney's car and loaded it in the trunk. 
With the defendant and Ricci as passengers, Feeney drove the car toward
the towns of Walpole and Norfolk. 
Eventually, Feeney stopped the car in a wooded area and directed Ricci
and the defendant to dump the body there. 
The defendant and Ricci exited the car, dragged the body into the woods
using the tarp, and covered it with branches and leaves.  After the defendant and Ricci returned to the
car, Feeney drove them back to Ricci's home. 
During the drive, Feeney told Ricci and the defendant:  "Keep your mouth shut if you know what's
good for you."  
      ii. 
The investigation.  On the day of
the kidnapping, after waiting to hear from the victim, members of his family
began "calling his cell phone constantly" but did not get an
answer.  The victim's father then began
calling jails, hospitals, and police stations. 
The next day, the victim's father reported the victim as missing to the
police.  Two days after the kidnapping,
on January 3, State police became involved in the investigation.  
      During the investigation, the police
interviewed people close to the victim, including his parents and his romantic
partner.  From these interviews, the
police learned of Feeney's connection to the defendant, and on January 9, police
interviewed Feeney.  During his
interview, Feeney told police he was at his apartment on the day of the
kidnapping and then traveled later that day to his mother's house in
Dedham.  Feeney also told police the
defendant was his mechanic. 
      On February 27, 2014, Dedham and State
police officers searched Feeney's apartment pursuant to a warrant.  Of note, the officers seized a black duffel
bag containing a black police baton, handcuffs, leg irons, zip ties, packaging
from the zip ties, and a pink rag. 
Later, the police baton, the inside and outside of the black duffel bag,
and a red-brown stain on the outside of the zip tie packaging all tested
positive for the presence of blood. 
Additionally, swabs taken from the police baton and the red-brown stain
on the zip tie packaging subsequently yielded deoxyribonucleic acid (DNA)
profiles that matched the victim's DNA profile.
      In addition to interviewing Feeney, the
police also conducted several interviews with Ricci and the defendant.  The defendant admitted to the police that he
was friends with Feeney but denied having been with him on the day of the
kidnapping.  Ricci also initially denied
being with Feeney on the day of the kidnapping. 
However, during a subsequent interview, Ricci told police portions of
what occurred the day of the kidnapping, though he did not disclose details
about disposing of the victim's body. 
After this interview, Ricci, Feeney, and the defendant were arrested.  Despite these arrests, however, the victim's
whereabouts remained unknown for nearly two years after his disappearance.
      On December 26, 2015, hunters discovered a
human skull in a wooded area and called the police.  Responding officers searched the area where
the skull was found.  Nearby, they discovered
a pelvic bone, a sneaker, and a disintegrated pair of jeans with a claddagh
ring in one of the pockets.  Additional
searches of the area were conducted into 2016. 
During these searches, investigators discovered other bones, such as a
lower jawbone, multiple ribs, numerous vertebrae, three long bones, a scapula,
and a clavicle.  Investigators also found
other clothing, including a sweatshirt, a pair of tattered boxer shorts, and
socks.  Lastly, investigators located
various items, including a casino rewards card in the victim's name, a bank
card in the victim's name, a piece of duct tape, and three cigarette butts near
where the remains were found.
      Comparing the skull and jawbone to the
victim's dental records, a forensic odontologist identified the remains as
those of the victim.  The victim's cause
of death could not be determined due to the decomposition of the remains.  As only bones were recovered, the medical
examiner had "difficult[y] . . . evaluat[ing] any kind of injury
to the soft tissues."  There were
some "defects" around the nasal bone area that could have been a
fracture; however, the medical examiner could not determine whether the damage
occurred before or after death.
      b. 
Procedural history.  The defendant
was indicted for kidnapping, G. L. c. 265, § 26,[5] and
conspiracy, G. L. c. 274, § 7. 
After the victim's body was discovered, additional indictments were
issued charging the defendant with murder, G. L. c. 265, § 1,
and aggravated kidnapping, G. L. c. 265, § 26, third par.  
      At trial, after the Commonwealth rested
its case, the defendant moved for a required finding of not guilty on the
aggravated kidnapping charge, arguing that the dangerous weapon with which a
defendant is armed must also be used to inflict the serious bodily injury
required under G. L. c. 265, § 26, third par.  The trial judge denied the motion, reasoning
the natural reading of the statute does not require the actor to use the same
weapon to kidnap and to inflict serious bodily injury.
      The defendant also objected to the jury
instructions on the same ground.  The
judge overruled his objection and instructed the jury that, to support a
conviction of aggravated kidnapping, the Commonwealth must prove "the
defendant committed the kidnapping while armed with a dangerous weapon"
and "inflicted serious bodily injury upon [the victim]" but
"[t]he Commonwealth is not required to prove that the defendant used the
dangerous weapon to inflict the serious bodily injury -- the two elements
are independent of each other."
      The jury found the defendant guilty of
involuntary manslaughter, as a lesser included offense to the charge of murder
in the first degree, as well as conspiracy to kidnap and aggravated kidnapping.[6]  The defendant was sentenced to from
twenty-five to thirty years in State prison on the aggravated kidnapping
conviction, and concurrent sentences of from six to eight years and from four
to five years on the manslaughter and conspiracy convictions,
respectively.  
      After the defendant appealed, a divided
Appeals Court panel affirmed his aggravated kidnapping conviction, reasoning
the language of the kidnapping statute did not require serious bodily injury to
be inflicted by means of the dangerous weapon to support a conviction of
aggravated kidnapping.  See Commonwealth
v. Morrison, 103 Mass. App. Ct. 263, 264, 267-269 (2023).  The dissent, however, concluded that, because
the plain language and legislative history of the statute is ambiguous on this
issue, the rule of lenity should apply. 
Id. at 273-280 (Sacks, J., dissenting in part).
      We allowed the defendant's application for
further appellate review, limited to the issue of the construction of
G. L. c. 265, § 26, third par.
      2. 
Discussion.  The defendant raises
two interrelated claims regarding his aggravated kidnapping conviction.  He argues his motion for a required finding
of not guilty should have been allowed on the aggravated kidnapping charge, and
that the trial judge erred by instructing the jury that "[t]he
Commonwealth is not required to prove that the defendant used the dangerous
weapon to inflict the serious bodily injury," rather than charging that
the Commonwealth is required to prove as much. 

      Both arguments hinge on the proper
construction of G. L. c. 265, § 26, third par.  
      a. 
The kidnapping statute.  We review
questions of statutory interpretation de novo. 
See Commonwealth v. James, 493 Mass. 828, 834 (2024).  In doing so, we begin our analysis by looking
to the statute's language and endeavor to give effect to the plain and ordinary
meaning of each word, not rendering any word superfluous.  See Commonwealth v. Vigiani, 488 Mass. 34, 36
(2021).  "[W]e derive the words' usual
and accepted meaning from sources presumably known to the statute's enactors,
such as their use in other legal contexts and dictionary definitions"
(citation omitted).  Id.  
      Here, G. L. c. 265, § 26,
third par., provides, in relevant part, that a person who "commits
[kidnapping] while armed with a dangerous weapon and inflicts serious bodily
injury thereby upon another person" shall be punished (emphasis added).[7]  To resolve this case, we must discern the
meaning of the word "thereby." 
Specifically, we must determine whether "thereby" refers to
the entire phrase "[kidnapping] while armed with a dangerous weapon"
or instead refers only to the "dangerous weapon."  
      We turn first to dictionary definitions
and other sources presumably known by the Legislature.  See Vigiani, 488 Mass. at 36.  The word "thereby" is an adverb,
defined as "by that" or "by means of that."  Random House College Dictionary 1363 (rev.
ed. 1984).  See Morrison, 103 Mass. App.
Ct. at 268.  Therefore, if we were to
replace "thereby" with either "by that" or "by means
of that," the third paragraph of the kidnapping statute could be read
as:  "Whoever commits [kidnapping]
while armed with a dangerous weapon and inflicts serious bodily injury [by that
or by means of that] . . . shall be punished . . . ."  G. L. c. 265, § 26, third
par.  The question then becomes which
antecedent[8] "that" is referring to: 
the entire phrase "[kidnapping] while armed with a dangerous
weapon" or just "dangerous weapon."    
      The answer to this question is not
immediately clear.  As the dissent in the
Appeals Court explained:
"If we
substitute [the entire phrase] . . . the provision would read,
'whoever commits kidnapping while armed with a dangerous weapon and inflicts
[serious bodily injury] by kidnapping [while armed with a dangerous weapon]
upon another person . . . shall be punished.' . . .  [This interpretation] does not require that
the [serious bodily injury] be inflicted by the dangerous weapon, and it is
plausible.
"But if
instead we substitute [only] 'dangerous weapon' . . . the provision
would read, 'whoever commits kidnapping while armed with a dangerous weapon and
inflicts [serious bodily injury] by [means of that] dangerous weapon upon
another person . . . shall be punished.'  This is the defendant's interpretation.  It does require that the [serious bodily
injury] be inflicted by the dangerous weapon, and it, too, is
plausible."  (Footnote omitted.)
Morrison, 103
Mass. App. Ct. at 274 (Sacks, J., dissenting in part).  Because both interpretations are plausible,
the provision is ambiguous.   
      Generally, where a statute is unclear, we
may then "turn to the history of the statute" for clarity.  Commonwealth v. Hamilton, 459 Mass. 422, 433
(2011).  We have conducted a
comprehensive review of the kidnapping statute's legislative history and find
the Legislature's intent behind the inclusion of the word "thereby"
in the third paragraph insufficiently clear.[9]
      When, as here, we cannot discern the
legislative intent behind ambiguous language in a criminal statute, the rule of
lenity requires that we give the defendant "the benefit of any rational
doubt" and resolve any ambiguity in favor of the defendant (citation
omitted).  Commonwealth v. Rossetti, 489
Mass. 589, 599 (2022).  Accordingly, we
hold that G. L. c. 265, § 26, third par., requires the Commonwealth
to prove that the dangerous weapon with which a defendant was armed was used to
inflict serious bodily injury.  In other
words, we read the relevant portion of the statute to mean:  "[w]hoever commits [kidnapping] while
armed with a dangerous weapon and inflicts serious bodily injury [by means of
that dangerous weapon] . . . shall be punished."  G. L. c. 265, § 26, third par.[10]
      We turn now to the defendant's arguments
that there was insufficient evidence that serious bodily injury was inflicted
by means of the dangerous weapon and that the jury instructions were
erroneous.  
      b. 
Sufficiency of the evidence. 
Turning first to the denial of the defendant's motion for a required
finding of not guilty, we consider whether, when viewed "in the light most
favorable to the Commonwealth . . . [the] evidence is sufficient to
satisfy a rational trier of fact that each element of the crime charged could
be found beyond a reasonable doubt." 
Commonwealth v. Lopez, 484 Mass. 211, 215 (2020).  Considering our construction of the
kidnapping statute, we must determine whether there was sufficient evidence
that either the defendant or one of his coventurers -- given the
Commonwealth proceeded on a theory of joint venture liability -- was armed
with a dangerous weapon during the course of the kidnapping and used that
weapon to inflict serious bodily injury on the victim.  
      We first consider the gun in the
defendant's holster as the dangerous weapon. 
Multiple witnesses testified the defendant was in possession of this gun
when he removed the victim from his home. 
Thus, there was sufficient evidence to support a finding that the
defendant was "armed" with the gun.
      No evidence was presented, however, that
the gun was used to harm the victim. 
Investigators were unable to determine the victim's cause of death or if
any injuries were inflicted on the soft tissues of the victim's body, as only
the victim's bones were recovered. 
Additionally, Ricci did not testify that he saw or heard the victim
being shot, nor did any other witness. 
Thus, there was insufficient evidence to prove the gun was used to
inflict serious bodily injury on the victim. 

      We next consider the police baton Ricci
observed in the garage.  There was
sufficient evidence the defendant's coventurer, Feeney, was armed with the
police baton during the kidnapping. 
According to Ricci's testimony, Feeney entered the garage carrying a
black bag, which he set on the ground before shackling the victim's
ankles.  Around this time, Ricci observed
the baton "right there with the bag," which "could have been in
[Feeney's] hand" when Ricci left the garage.  This evidence supports a finding that Feeney
was armed with the baton during the kidnapping. 
See Commonwealth v. Powell, 433 Mass. 399, 403 (2001) (armed robbery
requires "the defendant had to have [a dangerous weapon] in his
possession").
      The evidence further supported a finding
that Feeney used the police baton to inflict serious bodily injury on the
victim.  As Ricci testified, after Feeney
was left alone in the garage with the victim, Ricci heard an "oomph"
sound coming from the garage.  The baton
was later found by the police in Feeney's apartment with the victim's blood on
it, suggesting that -- regardless of whether the baton was the ultimate
cause of death -- Feeney severely beat the victim with the baton.  
      Further, there was sufficient evidence to
find the defendant knew Feeney was armed with the police baton.  See Commonwealth v. Britt, 465 Mass. 87, 100
(2013) (when offense "has use or possession of a weapon as an
element," Commonwealth must show "that a joint venturer had knowledge
that a member of the joint venture had a weapon").  Ricci testified that the black duffel bag was
sitting in the front passenger seat of the defendant's car when they removed
the victim from his home.  Ricci then saw
the defendant give Feeney the bag when they arrived at Ricci's garage.  From this testimony, a rational fact finder
could infer the police baton, along with the other kidnapping tools later
recovered from Feeney when investigators searched his home, was inside the bag
when the defendant provided it to Feeney. 
See Commonwealth v. Latimore, 378 Mass. 671, 676-677 (1979).  Further, the defendant was present in the
garage when Feeney was restraining the victim, at which time the baton was in
view.  
      Finally, there was sufficient evidence the
defendant, as a joint venturer, "had or shared the required criminal
intent."  Commonwealth v. Zanetti,
454 Mass. 449, 466-467 (2009). 
Kidnapping requires  "the
intent to confine or imprison another person against his will."  Commonwealth v. Schoener, 491 Mass. 706, 725
(2023).  As discussed previously,
evidence was presented that Feeney explained his kidnapping plan to the defendant,
which the defendant then took steps to effectuate.  Significantly, the defendant removed the
victim from his home under false pretenses and, with the help of Ricci,
restrained the victim in the back seat of a car using handcuffs. 
      The defendant then brought the victim into
Ricci's garage, sat him in the metal chair that he had fastened to the floor,
and stood by while Feeney shackled the victim's ankles to the chair.  The defendant's intent to secretly confine or
imprison the victim against the victim's will can be inferred from these
actions.  See Commonwealth v. Gorassi,
432 Mass. 244, 250 (2000) (fact finder could "reasonably . . .
infer[] that the defendant intended to kidnap the [victim]" from
"evidence that the defendant falsely enticed the [victim] into the crafts
room").  See also Commonwealth v.
Pucillo, 427 Mass. 108, 112 (1998) ("jury may infer the requisite mental
state from the defendant's knowledge of the circumstances and subsequent
participation in the offense" [citation omitted]).  
      Viewed in the light most favorable to the
Commonwealth, there was sufficient evidence from which a rational fact finder
could conclude that the defendant committed aggravated kidnapping pursuant to
G. L. c. 265, § 26, third par., under a joint venture theory of
liability.  See Latimore, 378 Mass. at
676-677.  Thus, the trial judge did not
err in denying the defendant's motion for a required finding of not guilty.
      c. 
Jury instructions.  Turning next
to the jury instructions, for the reasons previously stated, the trial judge
erred by instructing the jury that "[t]he Commonwealth is not required to
prove that the defendant used the dangerous weapon to inflict the serious
bodily injury -- the two elements are independent of each other."  Because the defendant objected at the time of
trial, we review this error to determine whether it prejudiced the
defendant.  See Commonwealth v. Teixeira,
486 Mass. 617, 622 (2021).  
      We conclude this instruction was
prejudicial.  The Commonwealth proceeded
at trial on two theories -- that either the gun or the baton could satisfy
the "dangerous weapon" element. 
Yet, as discussed, the baton was the only viable implement under a
proper construction of the statute. 
Based on the erroneous instructions they received, the jury could have
found either the gun or the baton to be the "dangerous weapon."  Because we do not know on which theory the
jury rendered their verdict, the defendant's conviction of aggravated
kidnapping cannot stand.  See
Commonwealth v. Fickett, 403 Mass. 194, 197 (1988).  See also Commonwealth v. Nadal-Ginard, 42
Mass. App. Ct. 1, 4 (1997).
      3. 
Conclusion.  For the reasons
discussed above, we vacate the defendant's conviction of aggravated kidnapping
and remand for further proceedings consistent with this opinion.  Because the errors in this case were limited
to the aggravating elements of the offense, "on remand the Commonwealth
has the option of moving to have the defendant sentenced on the lesser included
offense[]" of kidnapping, G. L. c. 265, § 26, first par.,[11]
"or of retrying the defendant" on the charge of aggravated
kidnapping.[12]  Commonwealth v. Kastner,
76 Mass. App. Ct. 131, 141 (2010).
So ordered.
Appendix.
Model Jury
Instruction -- Armed Kidnapping Aggravated by Infliction of Serious Bodily
Injury.
      The defendant is charged with kidnapping
while armed with a dangerous weapon, thereby inflicting serious bodily injury,
as an aggravated form of kidnapping defined by the State Legislature.  The Massachusetts kidnapping statute includes
all forms of unlawful restraint of the liberty of a person, including the
forcible confinement of the person against his or her will.  In order to prove the defendant guilty of
this offense, the Commonwealth must establish the defendant's guilt on a charge
of kidnapping and must prove the following two additional elements beyond a
reasonable doubt:
           
First:  That the defendant
committed the kidnapping while armed with a dangerous weapon; and
      Second: 
That the defendant used the dangerous weapon that he was armed with to
inflict serious bodily injury on the victim.

footnotes

[1] Ricci
testified for the prosecution as part of a cooperation and plea agreement.

[2] Feeney
obtained these materials from Michael Schoener, a Dedham police officer to whom
Feeney supplied drugs.  See Commonwealth
v. Schoener, 491 Mass. 706, 709 (2023). 
Schoener was charged and convicted of being an accessory before the fact
to kidnapping, G. L. c. 265, § 26; we affirmed his conviction.  See id. at 707, 729.

[3] The defendant
had previously served jail time in Dedham.

[4] A claddagh is
"an Irish design (as on a ring) of two hands holding a crowned heart that
symbolizes friendship, loyalty, and love." 
Merriam-Webster Online Dictionary,
https://www.merriam-webster.com/dictionary/claddagh
[https://perma.cc/E5YW-QZ3L].

[5] The
kidnapping charge was ultimately dismissed as a lesser included offense of
aggravated kidnapping.

[6] Feeney was
tried jointly with the defendant and found guilty of murder in the first
degree, aggravated kidnapping, and conspiracy to kidnap.  Feeney appealed and subsequently filed a
motion for a new trial, which we remitted to the Superior Court.  Feeney's appeal is stayed pending a decision
on the motion for a new trial.  See
Commonwealth vs. Feeney, SJC-13163.

[7] General Laws
c. 265, § 26, third par., also prohibits kidnapping aggravated by
sexual assault.  See Commonwealth v.
Rodriguez, 83 Mass. App. Ct. 267, 270 (2013). 
The Commonwealth did not proceed under this theory.

[8] An antecedent
is "a substantive word, phrase, or clause whose denotation is referred to
by a pronoun that typically follows the substantive (such as John in 'Mary saw
John and called to him')" (emphasis in original).  Merriam-Webster Online Dictionary,
https://www.merriam-webster.com/dictionary
/antecedent
[https://perma.cc/K2PQ-LBLK].  In the
example, the pronoun "him" refers back to "John," which is
the antecedent basis. 

[9] What little
can be gleaned from the legislative history is far from conclusive.  For example, as explained by the Appeals
Court dissent, a floor amendment in the House of Representatives contained
proposed statutory language different from the final law.  See Morrison, 103 Mass. App. Ct. at 278-279
(Sacks, J., dissenting in part).  Among
the differences, the floor amendment omitted the word "thereby" in the
provision prohibiting aggravated kidnapping. 
Id.  Although this history is
arguably consistent with the defendant's preferred interpretation, it is not
necessarily more consistent.  See id. at
279.  

[10] A model jury
instruction for aggravated kidnapping by infliction of serious bodily injury is
set forth in an Appendix to this opinion.

[11] On remand,
the Commonwealth cannot move for sentencing on the lesser offense of kidnapping
"while armed with a firearm" pursuant to G. L. c. 265,
§ 26, second par., because there was no evidence presented at trial
showing that the holstered gun met the statutory definition of a firearm.  See G. L. c. 140, § 121
(defining "firearm" for purposes of licensing and regulations as
"a stun gun or a pistol, revolver or other weapon of any description,
loaded or unloaded, from which a shot or bullet can be discharged and of which
the length of the barrel or barrels is less than [sixteen] inches or [eighteen]
inches in the case of a shotgun as originally manufactured").  See also Commonwealth v. Garrett, 473 Mass.
257, 260 (2015) ("[the] definition [in § 121] . . . is the
foundation for the Legislature's gun control framework; indeed, the definition
was incorporated virtually unchanged from the 1934 version of the statute when
the Legislature rewrote the gun control act in 1998").

[12] Insofar as
there is a retrial, "the defendant may be retried only on [the]
theory" for which there was sufficient evidence at the original
trial -- i.e., the joint venture theory based on Feeney's use of the baton
to inflict serious bodily injury on the victim. 
Commonwealth v. Berry, 431 Mass. 326, 336 (2000).